George S. Canellos
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Room 400
New York, NY 10281-1022
(212) 336-0589 (Fischer)
Email: fischerh@sec.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────────

SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff,

  -against-

YONNI SEBBAG and BONNIE JEAN HOXIE,

     Defendants.
─────────────────────────────────────

10 CIV 4241

10 Civ. _____

**COMPLAINT**

  Plaintiff Securities and Exchange Commission (the "Commission") alleges the following against Defendants Yonni Sebbag ("Sebbag") and Bonnie Jean Hoxie ("Hoxie"):

**SUMMARY**

  1. This case involves a brazen scheme to sell material non-public information to various hedge funds with the expectation that the funds would trade based on the information provided. The defendants are Hoxie, an administrative assistant to a high-level executive at The Walt Disney Company ("Disney"), and her boyfriend, Sebbag. Beginning in March 2010, the defendants sent numerous hedge funds anonymous letters offering to provide the funds with inside information about Disney's quarterly earnings in exchange for a fee. In early May, Hoxie obtained pre-release results for Disney's second quarter 2010 ("2Q-2010") and provided it to Sebbag. Sebbag then sold the confidential information to an undercover agent from the Federal

Bureau of Investigation ("FBI"), who was posing as an investment manager. Sebbag offered to provide the undercover agent additional inside information about Disney on a regular basis in exchange for a share of the profits that the investment manager obtained from trading on the information.

2. By offering to sell and selling material non-public information to be used for purposes of insider trading, Sebbag and Hoxie engaged in acts or practices that constitute violations of the anti-fraud provisions of the federal securities laws. By this action, the Commission seeks an order providing for permanent injunctive relief against Sebbag and Hoxie, pursuant to Section 21(d)(1) of the Securities Exchange Act of 1934 ("Exchange Act"), permanently enjoining each defendant from violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and enjoining the defendants from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, and for any other relief that the Court may deem just and proper.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)].

4. Venue lies in this District pursuant to Section 27 of the Exchange Act. Certain of the acts, practices, transactions and courses of business alleged herein occurred within the Southern District of New York. Defendants contacted several hedge funds located in New York, New York offering to sell them confidential information regarding Disney. In addition, certain communications in furtherance of the scheme occurred within the Southern District of New

York. Moreover, Defendant Sebbag stayed at a hotel in Manhattan during his trip to New York City to collect payment for his sale of the material non-public information regarding Disney.

5. Defendants Hoxie and Sebbag have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged herein.

## DEFENDANTS

6. Sebbag, age 29, is a resident of California. Sebbag obtained material non-public information about Disney from his girlfriend, Hoxie, and sold that information to individuals with the understanding and intention that they would trade on the information. In various communications Sebbag used the alias "Jonathan Cyrus."

7. Hoxie, age 33, is a resident of California. Hoxie is the administrative assistant to a high-level Disney executive and has access to confidential information concerning Disney's financial performance and operating plans. Hoxie executed a "Confidentiality Agreement" with Disney wherein she agreed to "hold in strictest confidence, and not disclose to any person, firm or corporation . . . any confidential information or trade secret relating to the products, sales, or business of [Disney] and not to use any such confidential information or trade secret for [her] own benefit during the term of [her] employment or thereafter." Hoxie obtained material non-public information concerning Disney and provided that information to Sebbag with the expectation that she would be compensated.

## RELEVANT ENTITY

8.  **Disney** is a Delaware corporation that is headquartered in Burbank, California. Disney, along with its subsidiaries and affiliates, is an entertainment and media enterprise with four business segments: media networks, parks and resorts, studio entertainment, and consumer products. Disney's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act and trade on the New York Stock Exchange under the symbol "DIS."

## FACTS

### The Plan

9.  Beginning in early March 2010, various hedge funds, including several in New York, received letters from an anonymous sender claiming to be able to obtain pre-release access to Disney's 2Q-2010 quarterly earnings report and offering to share such information prior to its public release for a fee. The letters, post-marked from Los Angeles, California, stated:

> Hi, I have access to Disney's (DIS) quarterly earnings report before its release on 05/03/10 [sic]. I am willing to share this information for a fee that we can determine later. I am sorry but I can't disclose my identity for confidentiality reasons but we can correspond by email if you would like to discuss it. My email is eilatcap@gmail.com. I count on your discretion as you can count on mine. Thank you and I look forward to talking to you.

10. At least twenty hedge funds, including funds based in several U.S. states and European countries, received the same or substantially the same letter.

11. FBI agents set up an undercover operation and contacted the sender of the anonymous letter to express interest in such an arrangement. The FBI agents identified themselves as traders who had received the anonymous letters and were interested in receiving the Disney information in return for compensation (the "Putative Traders").

4

12. Sebbag, using the alias "Jonathan Cyrus," responded to the Putative Traders and commenced negotiations that ultimately resulted in the sale of Disney's confidential information to those traders.

13. In the time leading up to Disney's 2Q-2010 earnings announcement on May 11, 2010, the Putative Traders communicated with Sebbag on numerous occasions, both via email and telephone. During the course of these communications, Sebbag identified himself as a Disney insider who was able, by virtue of his position, to gain access to Disney's quarterly earnings reports several days before their public release. Sebbag offered to sell the Putative Traders this information.

14. Sebbag stated that he was looking to build a business relationship with the Putative Traders and was able and willing to provide them non-public information on a regular basis in the future. In these communications, Sebbag made clear that he understood that the information he was providing was non-public and that he expected the purchaser to trade on the information. Sebbag also made clear that he wanted to be compensated for the information, including sharing in any trading profits, that he understood his conduct carried "risks," and that he wanted to avoid getting caught.

15. Specifically, in emails and telephone calls with various Putative Traders, Sebbag made the following statements (spelling and punctuation in the original), among others:

- "First of all, i am not a fed, I have no way to prove it at this point but i am not asking you to disclose your identity not i will disclose mine. It is up to you to determine if this is worth the risk as i did. I work for Disney, that is all i can tell you."

- "I can deliver 3 to 4 days before release. I will email you the report as soon as i have it and you will wire transfer the money to my account after you get ahold of it. I am asking you to make me an offer based on the capital gains from the trade and the risk i am taking delivering

- this information to you? Also, i am looking to build a strong business relationship with you for future quarters and information."

- "I dont think we will get caught if we stay discret and careful. You can count on my discretion as i am counting on yours.... In regards to the earning reports, i will email it to you as soon as i have it and we'll make arrangements for the payment via wire transfer once you have it. Can you please make me an offer based on the money you think you will be making from the trade and the risk i am taking giving away this information to you? Also, i am looking forward to building a strong business relationship with you for future quarters and information."

- "We definitely have a deal with 50%-50% profit sharing. I am sending all the info as soon as i get it."

- "As i said in my letter, i am able to get the earnings report of Disney 3 to 4 days before they are out. I will be happy to email them to you for a fee that you can pay after you close your trades. Let me know if you are interested and how much i will get from you for this transaction. Also, i am looking to build a relationship for future earnings and other insider news."

- "I am not asking for any payment up front, i will email you the earnings report and you can pay me after. I was thinking that $20000 is a fair compensation but you are free to make an offer."

- "I am very serious and i will show you that very soon. $15k sounds great and $30k even better as i hope you will make a killing from Q2 earnings. I promise i will keep you informed of any unanticipated event, i keep my ears wide open here."

- "If uh, if you don't make so much, you know, you can always compensate me for whatever, but...Yeah! 50-50....Yeah! I think that fifty-fifty is good...." "The most important thing in all that is to not get caught...." "I get access to, uh, to mostly any information that comes to, um, through Disney, before, before, before the press." "...h- how much of a trade are you gonna do on such an operation, so I can have an idea of, you know, how much we can make, or not make...."

- "Well, i am getting you the earnings report 3 days before they come out and a payment should me made right after they are delivered and we will mdo so for every quarter. If any other important news comes up i will email it to you as welkl for another compensation. In other words, everytime you make money based on the info i am giving you i would like to be paid. how about doing a 50-50 profit sharing from your trades? Does that sound fair to you?"

**The Execution**

16. Based on these communications, Sebbag made specific arrangements with two Putative Traders to provide them material non-public information about Disney's 2Q-2010 earnings in return for compensation. In one such arrangement, Sebbag agreed to sell the information to a Putative Trader in exchange for $15,000. In the other, Sebbag agreed to provide the information to a Putative Trader in exchange for a fifty-fifty split of any trading profits made based on the inside information.

17. By email dated May 4, Sebbag wrote a Putative Trader that "I am letting you know that i will email you the earnings report this coming saturday (8th) sometime in the day therefore i suggest that you check your email first thing sunday morning." [sic]

18. On May 9, 2010, two days before Disney's 2Q-2010 earnings announcement, Sebbag emailed material non-public information concerning Disney's quarterly results to four accounts established by the Putative Traders. Specifically, Sebbag emailed the Putative Traders a 107-page document entitled "The Walt Disney Company Q2 Fiscal 2010 Key Topics Speaking Points" (the "Key Topics Document"). In the email attaching the Key Topics Document, Sebbag wrote "it looks like [he] will get [the earnings report] 2-3 hours before the market closes and will forward it . . . ."

19. With the exception of the first two pages, which contained only a table of contents and a listing of key topics, all pages in the Key Topics Document were headed "Confidential: For Legal Review Only." Moreover, the cover page contained a note saying that "anything in brackets ("[ ]") is confidential and for the reader's background only."

20. The Key Topics Document was a series of talking points that Disney executives could refer to while answering questions during an upcoming 2Q-2010 quarterly earnings

conference call and contained very detailed information about the quarterly performance and future prospects of Disney's various business segments.

21. On May 9, Sebbag informed the Putative Traders that he would gain access to the actual earnings report 2-3 hours before the close of the market on May 11, and would email the report to the Putative Traders before it was due to be released to the public after the market closed that same day.

22. However, Sebbag failed to deliver the earnings report to the Putative Traders as scheduled because his source and Disney insider, Hoxie, experienced a delay in obtaining the report. Emails between Hoxie and Sebbag reveal mounting frustration at the delay. For example on May 11, Hoxie e-mailed Sebbag: "I told you that you were going to be waiting . . . ." Sebbag responded "Just hurry up," to which Hoxie replied "I have no control over this. Patience is a virtue." Still waiting for the information later that day, Sebbag urged Hoxie to "Get things moving with all the powers you have." Hoxie replied "3 hours have come and gone what is another hour at this point. Chill."

23. In a further effort to calm Sebbag, Hoxie asked in another email sent on May 11: "What would you suggest I do. If I could wave my magic wand and give you what you want – I would. However, since that is not going to happen I suggest you call on you inner Buddhist – and CHILL the f' out."

24. Hoxie was ultimately unable to provide a copy of Disney's final earnings report for the 2Q-2010 and told Sebbag that "you will just have to work with what you have." Sebbag responded, "Ok I did with what I have so far, let's hope for the best."

25. Although she was unable to obtain a copy of the actual earnings report, Hoxie learned of Disney's Earnings Per Share (EPS) for the 2Q-2010, and provided that information to

Sebbag. Approximately two hours before the public release of Disney's EPS for the second quarter, Sebbag tipped a Putative Trader in a telephone conversation that Disney's EPS for the quarter was 48 cents. In this conversation, Sebbag assured the Putative Trader that "I know for sure that EPS is 48 cents." Sebbag also informed the Putative Trader that the actual EPS number was considerably better than analyst expectations: "Well, it looks like the market wants 46 cents but, it's looking closer to 48" . . . "You know, it's for sure 48."

26. A few hours later, after the market closed Disney reported that its quarterly EPS was 48 cents.

27. On the same day that Hoxie provided Sebbag with Disney's confidential EPS information – and Sebbag tipped the Putative Trader – Hoxie sent Sebbag an email laying claim to a share of the unlawful profits they expected to derive from the tip. Hoxie stated "here is the bag that you are going to get for me – thank [sic]," and attached a link to a picture of an expensive Stella McCartney designer handbag available for $700 at Neiman Marcus, an upscale department store. Sebbag replied that he would get Hoxie the bag "next week." Anticipating that they would receive substantial compensation from the Putative Traders, Sebbag stated "I may be able to [buy] u 2 of them, lol." Hoxie responded via email, "In that case, i also love love these shoes" and attached a link to a picture of expensive Stella McCartney shoes also sold at Neiman Marcus.

28. Shortly after issuing its quarterly earnings report, Disney held a conference call during which Disney executives discussed the company's 2Q-2010 quarterly results. Much of the information concerning Disney's performance results that was discussed on the call was reflected in the Key Topics Document that Sebbag had sent the Putative Traders prior to the public release of Disney's 2Q-2010 quarterly results. For example, Disney's Senior Executive Vice President and Chief Financial Officer said on the call that attendance at Disney's domestic

parks was down 4% from the prior year, that per capita guest spending was up 5%, and that occupancy at Disney's Orlando hotels was at 81%, 8% below prior year levels, while occupancy at its Anaheim hotels was at 67%, down 2% from the prior year. The executive also said that per room spending at Disney hotels was up 8% over the prior year. All of this information was contained in a chart detailing the 2Q-2010 performance of Disney's domestic parks in the Key Topics Document.

29. In another example, the Disney executive said that in the Consumer Products business segment, earned licensing revenues grew by 4% over the prior year. This information was also included (with the +4% figure in brackets indicating that the information had been considered confidential) in the Key Topics Document.

**The Payoff**

30. After providing the confidential information to the Putative Traders, Sebbag made arrangements to meet them in person in order to collect the agreed upon compensation.

31. At that meeting, which took place in New York on May 14, 2010, Sebbag met with two Putative Traders who paid him $15,000 in cash for the pre-release tips Sebbag provided concerning Disney's second quarter earnings. The Putative Traders pretended to be managers of a hedge fund that conducted large block trades of millions of shares at a time.

32. During the May 14 meeting, with a $15,000 payout within his grasp, Sebbag lifted the veil of his alias and revealed his true identity to the Putative Traders, who were in fact undercover FBI agents. At the meeting, Sebbag again asserted to the Putative Traders that he could obtain pre-release access to future press releases, and that if he didn't have enough time to email them to the Putative Traders he would contact them by telephone to provide the information before

it was released to the public. Sebbag further told the Putative Traders that he had access to, and could provide, other information that would "move the stock up and down."

33. Sebbag further explained that while he did not work for Disney, he could obtain Disney's confidential information from his girlfriend who was a secretary to a high-ranking Disney executive. Sebbag specified that his source at Disney worked for one of the top three or four executives at Disney. Sebbag further told the Putative Traders that his confederate was able to view all major internal corporate emails and that she had agreed to provide them to him. In order to ensure that his confederate remained in her position and did not seek a promotion or to be shifted to another department, Sebbag told the Putative Traders that he was sharing a portion of the $15,000 payment that they paid him in return for Disney's confidential information.

34. Sebbag further explained during the May 14 meeting with the Putative Traders that he wanted "to make a lot of money" through the arrangement with the Putative Traders wherein he would be paid for providing confidential, market-moving information about Disney. Sebbag also asked the Putative Traders for their advice on how to open up an off-shore account in order to deposit the proceeds of the scheme so as to avoid notice by enforcement authorities, stating he didn't "want to go to jail."

35. Sebbag stated that he would travel to Israel to open up an account there, and suggested to the Putative Traders that the account be structured as a sham investment account in order to provide a rationale for the Putative Traders to wire funds to him there. Further expressing his interest in avoiding detection, Sebbag agreed to conduct future discussions with the Putative Traders via prepaid cell phones which would be regularly switched to make detection of the scheme more difficult.

36. Sebbag left the May 14 meeting with the Putative Traders with an envelope containing $15,000 cash and subsequently made arrangements to meet with the Putative Traders in California to continue to build the illicit relationship. Instead, the FBI arrested Sebbag and Hoxie on May 26, 2010.

## CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Antifraud Provisions - against all Defendants)

37. The Commission realleges and incorporates by reference paragraphs 1 through 36, as though fully set forth herein.

38. Defendants, by engaging in the conduct described above, directly and indirectly, in connection with the intended purchase and sale of securities, and by use of the means and instrumentalities of interstate commerce and of the mails, have: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices or courses of business that have operated or will operate as a fraud and deceit upon other persons.

39. Defendants Sebbag and Hoxie obtained material non-public information about Disney's financial results and sold that information to the Putative Traders. Hoxie obtained the material non-public information regarding Disney as a result of her employment at Disney, and Hoxie provided the information to Sebbag, with whom she had a pre-existing relationship, with the understanding that Sebbag was going to sell the information to persons who were expected to trade based on the information. Hoxie expected to, and did, receive a benefit in exchange for providing the information to Sebbag. Sebbag knew or should have known that the information regarding Disney that he sold to the Putative Traders was material non-public information that had been

communicated to him by a Disney insider in breach of a fiduciary duty, or similar duty of trust and confidence, that Hoxie owed to Disney.

40. By virtue of her position as an employee of Disney, and as a consequence of executing a Confidentiality Agreement when she began her employment at Disney, Hoxie owed a fiduciary duty, or similar duty of trust and confidence, to Disney which prohibited her from, among other things, using or disclosing material non-public information learned during the scope her employment.

41. At all relevant times, Sebbag and Hoxie knew or were reckless in not knowing that the information that they provided to the Putative Traders was material, confidential, and non-public. In communicating material non-public information to the Putative Traders, the defendants knowingly or recklessly breached a fiduciary or similar duty of trust and confidence that was owed to Disney.

42. Sebbag and Hoxie provided material nonpublic information to the Putative Traders with the stated intention of receiving a material benefit in return, either in the form of an outright payment or as a share in the profits to be made by the Putative Traders.

43. By the conduct described above, Defendants Sebbag and Hoxie directly or indirectly violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## RELIEF SOUGHT

**WHEREFORE**, the Commission respectfully requests that this Court issue a Final Judgment:

### I.

Permanently enjoining, under Section 21(d)(1) of the Exchange Act, the Defendants, and their agents, servants, employees, and attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder; and

### II.

Granting such other and further relief as the Court shall deem just and proper.

Dated:   May 26, 2010
         New York, New York

By: _____
George S. Canellos
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, New York 10281-1022
(212) 336-0589 (Fischer)

Of Counsel:
David Rosenfeld
Ken C. Joseph
Howard Fischer
Jason E. Friedman